CHRISTOPHER FINNERAL
February 6, 2006

Page 46

1  Lowell Police Department have portable type strobes
2  or flashing lights for any of its cars?
3     A.  I'm not sure I understand what you mean by
4  portable.
5     Q.  Let's look at an exhibit. Actually, let's
6  look at several exhibits.
7
8        (Federal Signal Corporation correspondence
9        marked as Exhibit No. 4 for
10       identification.)
11
12       (Federal Signal Corporation correspondence
13       marked as Exhibit No. 5 for
14       identification.)
15
16       (Southwest Public Safety correspondence
17       Marked as Exhibit No. 6 for
18       identification.)
19
20    Q.  Okay. So, I'm not asking you whether the
21 Lowell P.D. had those specifics lights, but those are
22 three examples of the kinds of lights I'm asking you
23 about. Do you know whether the Lowell Police had any
24 of those kinds of portable lights on July 31st, 2001?

Page 47

1     A.  Not that I'm aware of. These two are the
2  same. I don't know. If you want to change.
3     Q.  Okay. But you're not aware of the Lowell
4  P.D. having any lights like that?
5     A.  I'm not aware of it.
6     Q.  Okay.
7
8        MR. FREDA: Excuse me. There's two of
9  those. That's different from the other ones.
10       MR. SHARP: Yes. Well, just to make the
11 record complete. Why don't we mark an exhibit seven
12 then go off the record.
13
14       (Halogen beacons correspondence marked as
15       Exhibit No. 7 for identification.)
16
17       (Off the record.)
18
19    Q.  Okay. So, we've had a little off the
20 record discussion, and we've added an Exhibit number
21 7.
22       Officer Finneral, so, having looked at
23 four, five, six and seven, you don't recall the
24 Lowell Police Department having any portable lights

Page 48

1  like that?
2     A.  Not that I have ever used.
3     Q.  Okay. Did the Buick Century have a horn?
4     A.  I'm sure it did but I didn't --
5     Q.  Do you know whether the horn was operating?
6     A.  No, I don't.
7     Q.  And one of the reasons you don't know
8  whether the horn was operating, is that you never
9  tried to use it on July 31st; isn't that right?
10    A.  Not that I recall.
11    Q.  Now, the car that you were driving had some
12 strobe light brackets on it?
13    A.  Yes.
14    Q.  And those were on the front?
15    A.  My recollection of the Buick, it had an, it
16 had a bracket still up under the rearview mirror that
17 would house a strobe light.
18    Q.  Oh, so, there was a bracket for a strobe
19 light on the inside of the windshield?
20    A.  That's my recollection.
21    Q.  Was there any strobe light in the car to
22 put on the bracket?
23    A.  It would be a permanently mounted strobe
24 light. The bracket was there. There was no strobe

Page 49

1  light. It's not something that you would take up and
2  down.
3     Q.  I see. But it was on the inside of the
4  windshield?
5     A.  Yes.
6     Q.  Would you be able to draw that do you
7  think?
8     A.  Kind of make a try at drawing that
9  bracket.
10    Q.  It's not an art class.
11
12       (Witness complies.)
13
14    A.  This is not going to be very good. If this
15 is the vehicle, your rearview mirror would be here.
16 And I believe there was a bracket that would house a
17 strobe light here up above, this being the front of
18 the car, some sort of a bracket here.
19       I don't recall exactly what it looked like,
20 but the bracket would be located above the rearview
21 mirror steering wheel.
22    Q.  Okay. Right. And could you just put on
23 there an arrow that points to it and a bracket. Just
24 write in bracket.

13 (Pages 46 to 49)

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

Page 54

1  you have followed somebody if they came out of that
2  house and got in a car and drove away?
3
4       MRS. McMAHON: Objection.
5       MR. FREDA: Objection. You can answer.
6
7    A.  If someone came out of the house, under
8  what conditions would I follow? Is that the
9  question?
10   Q.  Yes. On what conditions that day would you
11 have followed somebody away from that house?
12
13      MRS. McMAHON: Objection.
14
15   A.  I'm not sure I understand. If I believed
16 or we believed that it had something to do with the
17 robbery, I'm sure we would have followed somebody
18 leaving that house.
19   Q.  So, is it fair to say that when you went to
20 surveillance you knew that you might be following
21 somebody in your car that day away from that house?
22
23      MRS. McMAHON: Objection.
24

Page 55

1    A.  I would say it's not fair to say. I had no
2  idea what would transpire that day.
3    Q.  But one of the things that might transpire
4  when you're doing surveillance on a robbery suspect
5  is they might flee; right?
6    A.  Yes.
7    Q.  Okay. So, when you went out there, you had
8  some knowledge that that might happen; right?
9
10      MRS. McMAHON: Objection.
11
12   A.  Anything can happen.
13   Q.  Okay. And a suspect can flee; right?
14   A.  A suspect can flee, yes.
15   Q.  Okay. And you've had that happen at least
16 once before; haven't you?
17   A.  Yes.
18   Q.  I mean, you've had that happen many times
19 before; haven't you?
20   A.  In what context are we talking about?
21   Q.  Well, a robbery suspect fleeing?
22   A.  I can't recall ever having a robbery
23 suspect flee on me, no.
24   Q.  Okay. Have you ever been, and I understand

Page 56

1  when I use -- if I use the phrase, high speed pursuit
2  I understand we might have a little disagreement
3  about whether there was a high speed pursuit; okay.
4  But have you ever been involved in another automobile
5  pursuit where the cars went fast?
6
7       MRS. McMAHON: Objection.
8
9    A.  I've been in pursuits before. Fast, how
10 fast are we talking about?
11   Q.  Well, have you been involved in any
12 pursuits in the City of Lowell where the speeds
13 exceed forty miles an hour?
14   A.  Other than this one --
15
16      MRS. McMAHON: Objection.
17
18   A.  -- I couldn't say.
19   Q.  Have you been involved in pursuits in the
20 City of Lowell other than this one where the speeds
21 exceeded thirty miles an hour?
22
23      MRS. McMAHON: Objection.
24

Page 57

1    A.  I believe so, yes.
2    Q.  And are you able to recall what things you
3  did during those pursuits?
4    A.  Only one comes to mind.
5    Q.  Okay. Do you recall when that was?
6    A.  No.
7    Q.  Approximately?
8    A.  No.
9    Q.  Okay. Do you recall what you did during
10 that pursuit?
11   A.  Yes.
12   Q.  Okay. What did you do?
13   A.  Called in the, called in the pursuit,
14 activated lights and siren, called in a location of
15 travel and gave continuous updates as the pursuit
16 continued.
17   Q.  And was that pursuit in a Crown Victoria or
18 a marked cruiser?
19   A.  Crown Victoria.
20   Q.  And you can only recall that one other
21 pursuit?
22   A.  That I was the lead in, yes.
23   Q.  Okay. You were the driver in that one?
24   A.  Yes.

Page 62

1  Police Department on a high speed pursuit policy?
2     A. No.
3     Q. Can you recall whether it was more than
4  once?
5     A. I can't recall, no.
6     Q. Are you certain that that happened at least
7  once?
8     A. I believe so, yes.
9     Q. Are you able to recall whether it was
10 closer to 1994 or closer to 2001 --
11    A. No.
12    Q. -- when you got that training?
13    A. No.
14    Q. Do you recall who provided the training
15 about high speed pursuits in the Lowell in-service
16 training?
17    A. No.
18    Q. Do you recall the rank of the person who
19 provided that training?
20    A. No.
21    Q. Prior to July 31st of 2001, when is the
22 last time that you actually read the high speed
23 pursuit policy of the Lowell Police Department?
24    A. I couldn't say.

Page 63

1     Q. Did the Buick Century have air
2  conditioning?
3     A. I believe so.
4     Q. Did you have the windows up at anytime on
5  July 31st, 2001?
6     A. I couldn't say.
7     Q. Do you know whether you had the windows
8  down at anytime on July 31st, 2001?
9     A. I don't remember.
10    Q. Now, two stop signs on, did you draw the
11 stop signs on Exhibit number 2? I don't recall. Oh,
12 could you just put an "S" on Exhibit 2 where those
13 stop signs were.
14
15       (Witness complies.)
16
17    Q. Did you stop for those two stop signs?
18    A. I don't believe so.
19    Q. And when you're on Willard Street, you were
20 trying to catch up to Zazzara?
21    A. Yes.
22    Q. Were you catching up to him before he hit
23 Officer Anagnos?
24    A. I don't think so. He was in my sight, but

Page 64

1  I don't think I was catching up to him.
2     Q. Do you think you were losing ground?
3     A. I couldn't say. It was over very quick.
4     Q. Now, do you recall seeing a white car that
5  came to a stop, an abrupt stop, to avoid a collision
6  with either your car or the Mercedes?
7     A. Where? I don't know what you're talking
8  about.
9     Q. As you were going up Ashton Street?
10    A. I remember the traffic, and I couldn't say
11 what color, but I remember cars being stopped already
12 heading inbound on Willard Street that there were
13 cars already stopped there.
14    Q. But you don't specifically remember a white
15 car?
16    A. No.
17    Q. Now, could you please describe Ashton
18 Street in terms of, is it commercial, residential?
19    A. Residential.
20    Q. Okay. And is that a thickly populated
21 area?
22    A. I wouldn't say so.
23    Q. Okay. I mean, is it an apartment or single
24 family houses? Do you recall?

Page 65

1     A. My memory is that it was mostly single
2  family homes.
3     Q. So, I mean, it's a neighborhood where you'd
4  expect to see people out during the day?
5     A. I'm not real familiar with that
6  neighborhood.
7     Q. Where is the nearest school to Ashton
8  Street?
9     A. There's one on Beacon Street.
10    Q. Does that show on map, okay. Could you
11 just put a little square where that school would be?
12    A. I don't believe it would be on that map.
13    Q. Okay. Further down then?
14    A. Um-hmm.
15    Q. Are there any stores on Ashton Avenue?
16    A. No.
17    Q. How about Willard Street say, you know,
18 that segment between Ashton or Cheever and Humphrey
19 Street, how would you describe that street?
20    A. How would I describe it, residential.
21    Q. Are there any businesses along that
22 segment?
23    A. I believe so, but I couldn't say from
24 Ashton to Humphrey.

Page 66

1   Q. Yes.
2   A. I don't think so, no.
3   Q. Okay. But that's a place where you'd
4   expect to see traffic and pedestrians during the day?
5   A. It's a public street.
6   Q. Okay. So, you'd expect to see pedestrians
7   and traffic in that area during the day?
8   A. I believe there would be pedestrians and
9   traffic during the day on Willard Street, yes.
10  Q. When Zazzara hit Officer Anagnos, how far
11  behind would you estimate you were?
12  A. I believe that I was two or three hundred
13  feet behind him.
14  Q. And from your life experience, do you know
15  whether a horn from a Buick Century or similar car
16  can be heard from two or three hundred feet?
17
18      MR. FREDA: Objection. You can answer.
19      MRS. McMAHON: Objection.
20      MR. FREDA: You can answer.
21
22  A. I could only speculate.
23  Q. Well, what would your speculation be?
24

Page 67

1       MR. FREDA: Objection. Go ahead and
2   answer.
3       MRS. McMAHON: Objection.
4
5   A. I believe a horn can be heard from two or
6   three hundred feet, yes.
7   Q. So, if you had been blowing your horn,
8   somebody at the intersection of Humphrey and Willard
9   Street might have heard that; right?
10
11      MRS. McMAHON: Objection.
12      MR. FREDA: Objection. You can answer if
13  you know.
14      MR. SHARP: He doesn't need that much help.
15      MR. FREDA: I just wanted to make sure that
16  he knows after an objection he's supposed to answer.
17
18  A. I don't know what a person would hear at
19  the intersection of Humphrey and Willard.
20  Q. Do you think they might have heard it from
21  two or three hundred feet?
22
23      MRS. McMAHON: Objection.
24

Page 68

1   A. They might have, yes.
2   Q. So, if you had blown your horn, Officer
3   Anagnos might have heard that?
4
5       MRS. McMAHON: Objection.
6       MR. FREDA: Objection.
7
8   A. Might have, yes.
9   Q. So, looking at it in retrospect, do you
10  think it would have been a good idea to be blowing
11  your horn --
12
13      MRS. McMAHON: Objection.
14      MR. FREDA: Objection.
15
16  Q. -- while you were driving down Willard
17  Street?
18  A. Can you say that again?
19  Q. As you look back on it in retrospect, do
20  you think it might have been a good idea to be
21  blowing your horn as you were chasing this Mercedes
22  down Willard Street?
23
24      MRS. McMAHON: Objection.

Page 69

1
2   A. My retrospect, my recollection of the day,
3   was Mr. Anagnos was in the street and that he didn't
4   have a chance at the rate of speed that Mr. Zazzara
5   was going.
6   Q. And he especially didn't have any chance
7   without any warning; did he?
8
9       MRS. McMAHON: Objection.
10      MR. FREDA: Objection.
11
12  Q. He was in the middle of the street when he
13  was struck; right?
14  A. That's my recollection, yes.
15  Q. And, so, you'd agree with me that it took
16  some, at least some of the amount of time to get into
17  the middle of the street; right?
18
19      MRS. McMAHON: Objection.
20
21  A. I would agree that it, it would take time
22  to get from the side of the street to the middle of
23  the street, yes.
24  Q. Okay. And if during that time a pedestrian

18 (Pages 66 to 69)

Page 74

1  between 1994 and two-and-a-half years ago?
2      A. I don't recall the date. That's not the
3  best I could say, but I don't recall the date.
4      Q. Okay. But what's the most accurate you can
5  be?
6      A. Somewhere around 2000.
7      Q. Somewhere around 2000?
8      A. Yup.
9      Q. And what were the circumstances of this
10 accident?
11     A. The circumstances?
12     Q. Yes.
13     A. I was rear-ended by a drunk driver.
14     Q. While you were in a cruiser?
15     A. While I was in an unmarked police cruiser,
16 yes.
17     Q. Oh, bad luck for the drunk. When you
18 testified at the criminal trial, were you aware of
19 any immunities that you personally might have from
20 suit?
21     A. I don't remember.
22     Q. When you testified at the trial, were you
23 aware of whether Officer Anagnos' relatives or estate
24 would be able to sue you?

Page 75

1      A. Whether they would be able to?
2      Q. Yes.
3      A. I don't specifically remember. I remember
4  the suit coming about, and I was aware of it.
5      Q. Okay. But I'm talking about during the
6  time that you were involved in the prosecution of
7  Zazzara, were you aware that the Anagnos family or
8  the estate of Anagnos had the ability to sue you?
9      A. Like, I don't recall when I became aware of
10 it.
11     Q. Now, you talked a little while ago about
12 the EVOC course at Fort Devons?
13     A. Um-hmm.
14     Q. You'd never went to that course; did you?
15     A. Did I never went to it?
16     Q. Yes.
17     A. No. I believe I did go to that course.
18     Q. Okay. When did you go to it?
19     A. I don't know when I went to it.
20     Q. Well, do you recall? Well, did you go to
21 that course during the academy?
22     A. I went through a drive training at the
23 Police Academy. I'm not sure it was called EVOC.
24 That's what it's called at the Lowell Police

Page 76

1  Department. That's what it's referred to me as EVOC
2  training.
3      Q. Okay. And do you have any memory of going
4  through the EVOC training after the academy?
5      A. Yes.
6      Q. But you don't have any idea when it was?
7      A. No. It's a yearly -- I don't know. It
8  wasn't always there. It's something that's only been
9  going on for, I'm going to guess, the last five
10 years.
11         So, there was no such thing as EVOC
12 training when I first came out of the Police Academy
13 to my recollection, and that's something that the
14 police department instituted.
15         The Lowell Police Department instituted as
16 part of their in-service training.
17     Q. And you're certain you went to that?
18     A. Yes.
19     Q. Now, do you know after, well, Zazzara was
20 not prosecuted for any drug offense related to July
21 31st; is that right?
22
23         MRS. McMAHON: Objection.
24

Page 77

1      A. I had nothing to do with it. I was a
2  witness in the prosecution of Thomas Zazzara. I
3  wasn't the one bringing forth the prosecution.
4      Q. Okay. Did you learn or become aware of
5  whether any drugs were found on Zazzara or in his
6  vehicle on July 31st?
7      A. I don't know of any.
8      Q. Okay.
9      A. I didn't become aware of any.
10     Q. All right. So, did you learn or hear that
11 no drugs were found on Zazzara or in his car on July
12 31st, 2001?
13     A. I'm not aware of any drugs that were found
14 on Thomas Zazzara.
15     Q. Well, don't you know as a matter of fact
16 that there weren't any drugs found on Zazzara or in
17 his car on July 31st, 2001?
18     A. Not as a matter of fact. I'm not aware of
19 any that were found on him.
20     Q. Did you have any contact with Zazzara
21 before July 31st, 2001?
22     A. No.
23     Q. Did you have any knowledge of police
24 contact with Zazzara prior to July 31st, 2001?

20 (Pages 74 to 77)

Page 78

1    A.  I have never heard of him before.
2    Q.  And, so, if I understand you correctly as
3  of July 31st, 2001, you had never heard of Zazzara
4  before?
5    A.  I first became aware of Thomas Zazzara on
6  July 31st, 2001.
7    Q.  Okay.  During the pursuit of Zazzara, did
8  you receive any instructions from the dispatcher or
9  any other Lowell Police officer by way of your radio?
10   A.  Did I receive any transaction or?
11   Q.  Any instructions from a dispatcher or other
12  Lowell Police officer by way of your radio?
13
14       MRS. McMAHON:  Objection.
15
16   A.  If I understand the question properly, no,
17  I did not receive any instruction.  It was, I called
18  in a pursuit and they responded to me.  They didn't.
19  Nobody told me what to do.
20   Q.  Okay.  So, when you called in the pursuit,
21  how did the person on the other side of the radio
22  respond?  What did they say?
23   A.  If my memory is correct, like I said, as
24  working in the criminal unit, I would say something

Page 79

1  like, criminal to Lowell, and they would respond
2  back.  Go ahead criminal.  And then I believe, I
3  said, I'm in pursuit of a gray or silver Mercedes
4  Mass. license plate 4480 blah, blah, blah whatever it
5  is.  And then he would ask, and I think I said
6  something like heading inbound towards Bridge
7  Street.
8       So, then they would say, okay, criminal.
9  Then they would -- my memory is that they said
10  something like Lowell to car two, car two would be
11  the area cruiser, start heading that way.
12      Then the next transmission as I remember
13  was:  Start paramedics, start the ambulance.  He just
14  hit a pedestrian, and then my next transmission was
15  that they caught, received that okay, starting
16  paramedics.  And then my next transmission would have
17  been something something like:  I'm in the rear of
18  Market Basket with the suspect.
19   Q.  So, you thought that when you're back down
20  at the base of Ashton Avenue here on Exhibit number 2
21  where you drew that highlighted "X", what crime did
22  you suspect Zazzara had committed?
23
24       MRS. McMAHON:  Objection.

Page 80

2    Q.  If you suspected he committed any crime?
3    A.  I believe that, that a drug transaction had
4  taken place there.
5    Q.  Okay.  But you didn't know whether it was a
6  Class "B" or a Class "D" or any other class; right?
7    A.  Correct.
8    Q.  Did you suspect Zazzara of any crime other
9  than some type of drug transaction?
10   A.  When Zazzara drove behind the house on
11  Ashton Street, I believe he hit my partner with his
12  car.  So, because my partner had fallen off the side
13  of the driveway and I believe that he had just
14  already done a hit-and-run at that point.
15   Q.  Okay.  What did you do, if anything, to
16  ascertain your partner's condition after what you
17  thought was a hit-and-run?
18   A.  I pulled up to him.  I was going that way
19  anyways.
20   Q.  Right?
21   A.  He told me: I'm okay.  Go get him.  Go get
22  him.
23   Q.  But after your partner said: I'm okay.
24  Did you still think that there had been a

Page 81

1  hit-and-run?
2    A.  I thought that he had hit my partner with
3  his car.
4    Q.  Okay.  And I take it you didn't take the
5  time to ascertain just exactly what did happen?  You
6  were more intent on catching Zazzara; right?
7
8       MRS. McMAHON:  Objection.
9
10   A.  I wouldn't say I was more intent, but my
11  partner said he was okay, told me to go continue and
12  I did.
13   Q.  All right.  So, when you were chasing
14  Zazzara or pursuing Zazzara, you thought he had done
15  a hit-and-run on your partner; right?
16   A.  Yes.
17   Q.  Okay.  And you thought that he had engaged
18  in some type of drug transaction?
19   A.  Yes.
20   Q.  From what you were able to see from your
21  position, would this have been a large drug
22  transaction?  I mean, were you able to see how big of
23  an exchange took place?
24   A.  I would have no idea of the size of the

21 (Pages 78 to 81)