UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AMY ANAGNOS and THE ESTATE OF THEODORE ANAGNOS, DECEASED,<br>　　Plaintiffs<br><br>V.<br><br>THOMAS HULTGREN, in his official and personal capacities, CHRISTOPHER FINNERAL, in his personal and official capacities, OFFICER JOHN DOE, in his personal and official capacities, and THE CITY OF LOWELL, MASSACHUSETTS<br>　　Defendants | C.A. NO. 04-11664-JLT |

**DEFENDANT CITY OF LOWELL'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, the City of Lowell hereby submits the following undisputed facts:

1. On July 31, 2001, Lowell Police Officers Christopher Finneral ("Finneral") and Thomas Hultgren ("Hultgren") engaged in an on-duty undercover surveillance at CVS Pharmacy, at 1140 Bridge Street, Lowell, Massachusetts, relative to an oxycontin robbery investigation. (Exhibit 1, Deposition of Thomas Hultgren, p. 12-13; Exhibit 2, Affidavit and Statement of Police Officer Christopher Finneral, pg. 2).

2. At the time of the surveillance, Finneral operated an undercover police vehicle. (Exhibit 3, Deposition of Christopher Finneral, pg. 20)

3. While conducting surveillance, Finneral and Hultgren observed a Toyota approach and pull up to the house that was the subject of the surveillance. (Exhibit 3, pg. 26)

4.      Thereafter, Finneral observed a person come out of the house, head towards the Toyota, and engage in what Finneral believed was a drug transaction. (Exhibit 3, pg 26)

5.      After the transaction, the Toyota left the area and Finneral and Hultgren followed the Toyota, for a couple of miles while the Toyota zigzagged its way over towards the DeMoulas Supermarket parking lot on Bridge Street in Lowell. (Exhibit 3, pg 28)

6.      The Toyota eventually entered the parking lot, making several loops around the lot. (Exhibit 3, pg 28)

7.      At some point while the Toyota made loops in the parking lot, Finneral observed a black Mercedes in the lot, though Finneral did not observe any connection between the Toyota and the Mercedes until both vehicles pulled onto Ashland Street. (Exhibit 3, pg 29)

8.      There, the vehicles pulled next to each other and Finneral observed what he believed to be another drug transaction. (Exhibit 3, pg 35)

9.      Finneral and Hultgren then began to slowly approach the two vehicles, at which time the Toyota sped off, Hultgren jumped out of the undercover car and yelled at the Mercedes to stop. (Exhibit 3, pp. 35, 38)

10.     The Mercedes did not stop and Hultgren continued to yell at the operator of the Mercedes to stop. (Exhibit 3, pg 38)

11.     Finneral, at that point, decided to stay with and did stay with his partner, Hultgren, who ran next to the moving Mercedes and continued to yell to the operator to stop. (Exhibit 3, pg 40)

12.     Eventually, the Mercedes left the parking lot and accelerated onto Willard Street. (Exhibit 3, pg 43). As the Mercedes did this, Finneral thought that the Mercedes had hit Hultgren, who fell off to the side of the driveway. (Exhibit 2, pg. 3)

13.     Finneral followed the Mercedes onto Willard Street. (Exhibit 2, pg. 3)

14.     While on Willard Street, Finneral estimated the Mercedes' speed at close to fifty miles an hour. (Exhibit 3, pg 42-43)

15.     Finneral estimated the pursuit lasted twenty (20) seconds, before the driver of the Mercedes struck the decedent, Theodore Anagnos (hereafter referred to as "Theodore" or "Ted" Anagnos), who died at the scene. (Exhibit 3, pg 44)

16.     Finneral did not know the operator of the Mercedes, Thomas Zazzara ("Zazzara"), nor did he know Theodore Anagnos. (Exhibit 2, p. 1, ¶¶ 2 and 3)

17.     Finneral never intended to harm either Zazzara, Anagnos, or anyone else. (Exhibit 2, pg. 1, ¶¶ 4 and 5)

18.     Finneral followed Zazzara to apprehend Zazzara, as he believed Zazzara had committed a drug offense, and also believed Zazzara had hit Hultgren with the Mercedes. (Exhibit 2, ¶5)

19.     Finneral did not intend to worsen the legal plight of anyone. (Exhibit 2, ¶6)

20.     The Plaintiffs have admitted that they have no evidence, and will not be able to produce any evidence, that either Finneral or Hultgren intended to injure Theodore Anagnos, Thomas Zazzara or anyone else or to worsen their legal plight. (Exhibit 4, Responses 2 and 3)

21.     Thomas Zazzara failed to obey a lawful command of a police officer. Officer Thomas Hultgren, who wore a visible badge on his belt, advised Zazzara that he was a police officer and ordered Zazzara to stop on a number of occasions. Zazzara instead defied the lawful command of a police officer and fled the scene of a crime. (Exhibit 1, pgs. 37-39, 49, Exhibit 2, pg. 3)

22.     Upon seeing the accident, Finneral immediately called for medical assistance. (Exhibit 2, pg. 3, Exhibit 5, Lowell Dispatch Records.)

23.     The Lowell Police Department's Dispatch records show that Dispatch recorded a call regarding the hit pedestrian near Willard Street at 13:23:08. (Exhibit 5)

24. The ambulance records show that they received the call for medical assistance at 13:21, and were at the scene at 13:25. (Exhibit 6, Trinity EMS, Inc. Patient Care Report)

25. The records of the First Responder, Trinity EMS, indicate that Theodore Anagnos was not conscious. The records indicate that Theodore was not responsive when the emergency medical technicians arrived at the scene of the accident. Trinity's records indicate a clinical impression of "unresponsive," and show that his respirations, i.e. breathing, were assisted by a BVM (bag valve mask); he therefore was not breathing on his own. The technicians were performing CPR, and their records note that Theodore's pupils were unequal and unreactive to light. (Exhibit 6)

26. The records of the Advanced Life Support Crew also indicate that Theodore was not conscious at the scene. (Exhibit 7, Greater Lowell EMS records). The records indicate that he was "incontinent of urine," and therefore lacked bodily control. The records state "no peripheral pulse," "no palpable pulse" and note that he sustained "head trauma" because of a head fracture. When Theodore received advanced life support, he was intubated and required assisted breathing. (Exhibit 7)

27. The records of Lowell General Hospital indicate that Theodore Anagnos was not conscious. When he arrived at the hospital, he was unresponsive. The records indicate that he "lost consciousness," and was "unresponsive". Further, the records note "history unknown," indicating that the staff could not obtain any information from him. The records also state "no blood pressure via cuff," "no pulse," "no spontaneous oxygen." The EKG showed his heart only pumped with the assistance of CPR; when the CPR was paused for rhythm assessment, the EKG showed minimal cardiac activity. (Exhibit 8, records of Lowell General Hospital).

28.     None of the medical records indicate that Theodore Anagnos required a sedative for the intubation.

29.     The Plaintiff, Amy Anagnos (also known as Amy Skryness and Amy Barnes), married the decedent, Theodore Anagnos (also known as Ted) on July 19, 1997. (Exhibit 4, deposition of Amy Barnes, pg. 7)

30.     Amy began counseling sessions in November of 2000, almost 9 months prior to the accident which resulted in Theodore Anagnos' death. (Exhibit 9, Records of Russell Hart, LICSW, 11/8/00 and Exhibit 4, pg. 18)

31.     The notes from her intake interview note that she was having marital problems, was living apart from her spouse and had seen a lawyer. The counselor noted that Ted fought with Amy's parents and sister, he holds grudges and is verbally and emotionally abusive. The counselor noted that Ted "puts himself first," "talks down to" Amy, is loud and aggressive, called Amy "stupid/dumb/bitch/the c word." (Exhibit 9, 11/8/00 record)

32.     Amy's problems with Theodore began during their courtship. (Exhibit 4, p. 19)

33.     Shortly after their wedding, Amy became pregnant. Ted did not want the baby and Amy had to have an abortion. (Exhibit 4, pg. 20)

34.     Ted had trouble getting onto the Seabrook, New Hampshire police department due to his demeanor and mannerisms, and the department concluded that he was not best suited for law enforcement. (Exhibit 4, pgs. 20-21). This angered Ted, and he took his anger out on Amy. (Exhibit 4, pg. 21)

35.     Ted was controlling and emotionally abusive toward Amy. (Exhibit 4, pg. 15). He was very angry and took everything out on Amy. (Exhibit 4, pg. 16)

36. Ted was also physically abusive. He put Amy up against a wall a couple of times. (Exhibit 4, pg. 16). One such episode occurred while Amy was pregnant. (Exhibit 4, p. 29)

37. The couple separated in the summer of 2000. (Exhibit 4, pg. 8). On October 28, 2000, Amy asked Ted to move out of their apartment. (Exhibit 4, pg. 15). Ted protested, and Amy sought the assistance of her father and the Dracut Police Department to have Ted removed from the apartment. (Exhibit 4, pgs. 16-17)

38. Thereafter, Ted moved to a house Amy and Ted owned at 37 Henry Avenue in Lowell. (Exhibit 4, pg. 9) At some time in the fall of 2000, Amy moved to an apartment in Nashua. (Exhibit 4, pg. 31)

39. In the fall of 2000, Amy filed for divorce. Amy filed for divorce as the Plaintiff in a contested divorce at the Middlesex County Probate and Family Court. Her grounds for divorce were "irretrievable breakdown of the marriage." (Exhibit 4, pgs. 13-15, Exhibit 10, Complaint for Divorce)

40. After Ted moved out, Amy did not rely on Ted to pay any of her bills. Ted did not make any support payments to her. (Exhibit 4, p. 25)

41. At the time she began her counseling sessions, Amy's doctor had prescribed medication for sleep. She had a horrible appetite and had lost weight. She had trouble concentrating at home, was anxious, irritable and experienced crying spells. (Exhibit 9, 11/8/00 record)

42. In November 2000, Amy started taking Prozac for depression. She was diagnosed with major depression with anxiety. (Exhibit 9)

43. During the course of her counseling sessions in November 2000, Amy experienced crying spells, loss of appetite and sleeplessness. She was diagnosed with Post Traumatic Stress

Disorder. Her counselor noted that her anxiety was connected to self doubt. (Exhibit 9, 11/20/00 and 12/21/00 records)

44.     Amy's counselor's records show that she received a letter from Ted's lawyer in December 2000, and in February 2001, Ted did not respond to a 20-day notice to respond to the divorce. Her counselor's records further note that Amy had remained in an abusive relationship with Ted even before she married him. (Ex 9, 1/13/01 record)

45.     In March 2001, her counselor noted that Amy received a notice for an April court date. At that time, she thought about Ted's abuse and got scared, angry and sad. She was concerned that she would be depressed if she is alone. Her counselor's records clearly show that she was afraid of Ted, and was afraid of seeing him. (Exhibit 9, 3/20/01, 3/27/01 11/20/00, 2/13/01, and 4/17/01 records)

46.     In April 2001, both Amy and Theodore attended court proceedings for the divorce. After seeing Ted at the courthouse in April 2001, Amy was frightened and sad. She was frustrated by what he did to her. (Exhibit 4, 4/24/01 record)

47.     In May 2001, Amy experienced great depression and frustration. She felt like she wasted a large part of her life that she cannot get back. At the age of 30, she felt as though she lost the years when she was supposed to meet someone. She was mad at herself for marrying Ted for all the wrong reasons. She was experiencing Post Traumatic Stress Disorder-like symptoms and was depressed.  Amy indicated that she was willing to see a psychiatrist for her symptoms. (Exhibit 4, 5/22/01 and 5/30/01 records)

48.     Amy showed signs of stress and depression in June 2001. She was upset that she was not moving forward in life with marriage, kids and the house. (Exhibit 4, 6/6/01 record)

49.     In June 2001, Amy called the police because Ted was stalking her. On July 18, 2001, a couple of weeks before Ted's death, Ted cut Amy off his insurance. Amy was very angry with Ted and confronted him at his place of employment. Her counselor's notes state that she was mad, sad, angry and scared at that time, less than two weeks prior to Ted's death. (Exhibit 9, 7/18/01 record)

50.     On the date of Theodore Anagnos' death, July 31, 2001, the couple had already separated, were involved in divorce proceedings, and clearly did not have a positive relationship.

On August 28, 2001, after Ted's death, her counselor noted that she had panic attacks throughout the marriage. (Exhibit 9, 8/28/01 record)

51.     Amy's problems with anxiety date back to childhood. She had separation anxiety until about the 6th grade. She cried about going to school, and would experience stomach aches and other symptoms. She did not live away from home during college, then lived in her parents' house after she married Theodore. The only time that she lived on her own was when she and Ted separated. It made her anxious to be away from her family. (Exhibit 9, 9/12/02)

52.     Amy's counselor noted that she is immature, and also questioned "How much is connected to Ted's death". (Exhibit 9, 11/27/02 record)

53.     Thomas Zazzara was interviewed relative to the accident. He stated that he saw "the jogger" (Anagnos) as he was pulling his car out of the parking lot and straightening out his car. (Ex. 11, R. 28, 29). He stated that the jogger "cut out in front of the car." (Exhibit 11, Transcript Interview #1 of Thomas Zazzara, July 31, 2001. R. 28, R. 30).

May 22, 2006                                        CITY OF LOWELL, DEFENDANT

/s Kimberley A. McMahon
Kimberley A. McMahon, Assistant City Solicitor
BBO #641398
City of Lowell Law Department
375 Merrimack Street, 3rd Fl.
Lowell MA 01852-5909
(978) 970-4050
FAX (978) 453-1510