CHRISTOPHER FINNERAL
February 6, 2006

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

AMY ANAGNOS and THE ESTATE         C.A. No. 04-11664-JLT
OF THEODORE ANAGNOS, DECEASED,

             Plaintiffs

VS.

THOMAS HULTGREN, in his official and

personal capacities, CHRISTOPHER FINNERAL,

in his personal and official capacities,

OFFICER JOHN DOE, in his personal

and official capacities,

and THE CITY OF LOWELL, MASSACHUSETTS,

             Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF CHRISTOPHER FINNERAL

Law Office of Roland L. Milliard

1470 Lakeview Avenue

Dracut, Massachusetts

February 6, 2006           10:15 a.m.


Annmarie Pereira

Court Reporter

Page 6

1  three or four courses towards a masters degree, but I
2  haven't finished it.
3      Q.   Okay.  And when did you start your
4  undergraduate work?  What year?  Do you recall?
5      A.   No, I don't.
6      Q.   Okay.  When did you first join the Lowell
7  Police Department?
8      A.   I believe it was '94.
9      Q.   And had you had any employment before that?
10     A.   Employment before that, I was self-employed
11 before that.
12     Q.   Okay.  Self employed doing what?
13     A.   Construction, carpentry and construction.
14     Q.   And you were self employed during what
15 years?  Can you recall?
16     A.   I, probably for five years prior anyways.
17 Something like that I would say.
18     Q.   Okay.  And what's your date of birth?
19     A.   January 16th, 1968.
20     Q.   Did you have any employment before you were
21 self employed in construction and carpentry?
22     A.   Yes.
23     Q.   What was that employment?
24     A.   Do you want to go back as far as I can

Page 7

1  remember?
2      Q.   Sure.  First job.
3      A.   I bagged groceries at DeMoulas when I was
4  probably fourteen years old.  I had a paper route
5  before that.
6      Q.   Let's come after --
7      A.   I did some --
8      Q.   -- after the paper route.
9      A.   I did some construction work for a neighbor
10 while I was in high school, and then I worked
11 security at Wang Labs for awhile while I was in
12 college and worked for myself.
13     Q.   Do you still do any construction work in
14 self employment?
15     A.   Yes.
16     Q.   Okay.  And what is that?  Tell me about
17 that.
18     A.   I'm a general contractor.  Wide range of
19 things, I guess.
20     Q.   Okay.  And do you have employees or people
21 who regularly work for you or with you?
22     A.   No.
23     Q.   Does Mr. Hultgren do any work for you in
24 your general contractor capacity?

Page 8

1      A.   No.
2      Q.   So, are you a general contractor as kind of
3  a sideline to your police work?
4      A.   It's exactly more my main career right now
5  the construction.
6      Q.   Okay.  And why is that?
7      A.   Choice, personal choice.
8      Q.   Okay.  So, you joined the Lowell P.D. in
9  1994; right?
10     A.   Yes.
11     Q.   Okay.  And were you doing, say during 1995,
12 were you doing general contracting?
13     A.   Not much but a little, yes.  I always did
14 work while I was a police officer.
15     Q.   Okay.  But, so, is it fair to say that in
16 1995 you spent more time as a police officer than you
17 did as a contractor?
18     A.   Yes.  Yes.
19     Q.   And what about 1996, did you spend more
20 time --
21     A.   My whole career as a police officer, I
22 spent more time as a police officer than a
23 contractor.  Especially when I was a detective, it
24 was all consuming.

Page 9

1      Q.   Okay.  But if I understand you correctly
2  today, you're spending more time as a general
3  contractor than as a police officer?
4      A.   Yes.
5      Q.   Okay.  When did it come about that you were
6  spending more time as a contractor than a police
7  officer?
8      A.   Two, two-and-a-half years ago.
9      Q.   Okay.  And why is that?
10     A.   A personal choice.  I decided that I would
11 rather be a contractor than a police officer.
12     Q.   So, for the last two-and-a-half years, can
13 you approximate how many hours a week you've been
14 working for the Lowell P.D.?
15     A.   I don't know the exact dates, but
16 approximately zero hours a week.  I'm on an unpaid
17 leave of absence.
18     Q.   Okay.  When did you go on unpaid leave?
19     A.   I do not know.  About --
20     Q.   Well, do you know the year?
21     A.   About two, two-and-a-half years ago.
22     Q.   All right.  And why did you go on unpaid
23 leave?
24     A.   It was a personal decision that I made.

**Page 22**

1   A. The criminal bureau investigates what I
2 guess most people would consider the more serious
3 crimes, robbery, rapes, stabbings, shootings,
4 homicides, stuff like that.
5   Q. And the criminal bureau also conducts the
6 drug surveillance?
7   A. No.
8   Q. Okay. What department or division conducts
9 drug surveillance?
10   A. Vice Narcotics.
11   Q. So, why were you doing drug surveillance?
12 I mean, if you agree with me, that you were doing
13 drug surveillance?
14   A. I don't.
15   Q. Okay. What was it that you were doing in
16 the parking lot?
17   A. We were investigating a robbery.
18   Q. All right. And you had some reason to
19 believe that the people in the house you were
20 observing were connected to that robbery?
21   A. Yes.
22   Q. And, so, what were you hoping to see at
23 that location?
24

**Page 23**

1     MRS. McMAHON: Objection.
2
3   A. I wasn't hoping to see anything. It was
4 part of the investigation. We had information that
5 the person that may be involved lived there and we
6 were watching the location. It was part of the
7 investigation.
8   Q. In relation to the day you were in the
9 parking lot, when did the drugstore robbery take
10 place?
11   A. I don't know.
12   Q. Can you recall whether it was a month
13 earlier or two days earlier?
14   A. No, it was a recent robbery.
15   Q. Okay?
16   A. It was, you know, an active case.
17   Q. Okay. So, probably took place within a
18 week of your surveillance?
19   A. I, if I had to guess, I would say, yes,
20 within a week.
21   Q. Do you think it would have been within a
22 day or two?
23   A. I couldn't say. It was a fresh case. It
24 had just happened, and it was a sizeable robbery and.

**Page 24**

1   Q. Okay. And was the robbery of money or
2 pharmaceuticals or both?
3   A. Pharmaceuticals.
4   Q. And the pharmaceutical was Oxycontin?
5   A. Correct.
6   Q. Okay. Were there more than just Oxycontin
7 or it was a theft of Oxycontin?
8   A. There may have been more. I'm not sure.
9   Q. Okay. But you recall the Oxycontin for
10 sure?
11   A. Yes.
12   Q. And, so, can you help me to understand why
13 the criminal bureau was investigating that as opposed
14 to Vice and Narcotics?
15   A. I'll help you the best I can. It was a
16 robbery. We were investigating the robbery part of
17 it.
18   Q. Okay. What kind of things did you do when
19 you went to the parking lot and you were conducting
20 surveillance on a house, right, or it was an
21 apartment building?
22   A. It was a house.
23   Q. A house, okay. And what were you expecting
24 that you might see at the house?

**Page 25**

1   A. We were -- once again, I wasn't hoping to
2 see anything. We believed that to be the location of
3 somebody involved with the robbery.
4   Q. Okay. But, I mean, like, if you saw him
5 come out on the porch, were you going to arrest him
6 or, you know, you must have had some reason for
7 conducting the surveillance other than just looking
8 at the house?
9   A. I could not say what. I don't understand
10 what you're getting at. We were conducting a
11 surveillance on a house.
12   Q. Did you have an arrest warrant at that
13 time?
14   A. No, not that I know of.
15   Q. As between you and was it Detective
16 Hultgren at the time?
17   A. Yes.
18   Q. So, you were both detectives?
19   A. Yes.
20   Q. As between the two of you, who was in
21 charge?
22   A. We share the same rank.
23   Q. Okay. So, there wasn't a senior?
24   A. No.

Page 26

1  Q. Okay. All right. So, do you recall a
2  Toyota pulling up to the house?
3  A. Yes.
4  Q. Okay. How long had you been there before
5  the Toyota arrived?
6  A. I don't recall.
7  Q. Do you think it was more than an hour?
8  A. I don't recall.
9  Q. Do you think it was less than an hour?
10 A. I don't recall.
11 Q. But you do recall a Toyota pulling up?
12 A. Yes.
13 Q. Did the Toyota pull up to the curb or did
14 it actually pull up onto the lawn in this house?
15 A. It pulled onto the driveway. I think it
16 was a dirt driveway.
17 Q. Okay. And then what happened next?
18 A. A person came out of the house, and there
19 was a transaction that took place between the
20 occupants of the car and the person that came out of
21 the house and then the car left.
22 Q. Can you describe that transaction?
23 A. It was consistent with what we believed to
24 be a drug transaction.

Page 27

1  Q. Were you actually able to see the person
2  from the house hand something to the driver?
3  A. There was an exchange, yes.
4  Q. And was it the driver's side or the
5  passenger's side where this exchange occurred?
6  A. Passenger's side, I believe.
7  Q. Were you able to see somebody from the car
8  actually hand something to the person from the house?
9  A. That's what I believe transpired, yes.
10 Q. Okay. But could you actually see something
11 going --
12 A. That's what I believe to have taken place,
13 yes.
14 Q. Well, hold on a second, okay. Did you
15 actually see something being transferred from one
16 person's hand into another?
17 A. That's what I believe transpired, yes.
18 Q. All right. I know that you believe that
19 that's what transpired. I appreciate that. But I'm
20 asking something a little bit different. Did you
21 actually see something exchanged?
22 A. That's what I believe transpired. That's
23 what appeared to have happened, yes.
24 Q. Okay. Then what happened next?

Page 28

1  A. The Camry left and we followed the Camry.
2  Q. All right. And this was a maroon color?
3  A. Yes.
4  Q. And for how long did you follow the Camry?
5  A. I couldn't put a length of time on it, but
6  it was for a couple of miles and then the car
7  zigzagged its way over towards the DeMoulas parking
8  lot on Bridge Street at several different times
9  backtracking and making no sense with the direction
10 of travel.
11 Q. The DeMoulas, is that the Market Basket?
12 A. Market Basket, DeMoulas, I guess.
13 Q. It's the same thing?
14 A. Yes.
15 Q. I just went by there, so I wanted to make
16 sure I had the right place. And the car was
17 sometimes in Lowell and sometimes in Dracut?
18 A. I'm not sure that that Camry went into
19 Dracut until after it got in the parking lot on
20 Market Basket.
21 Q. Okay. And at some point it, like, pulled a
22 loop around some type of parking lot; is that right?
23 A. No, it entered the parking lot at Market
24 Basket, and it made several loops up and down the

Page 29

1  rows of cars in Market Basket and then pulled back
2  out onto Bridge Street heading towards Dracut at that
3  time.
4  Q. Okay. And you continued to follow it?
5  A. Yes.
6  Q. Now, at some point you noticed that the
7  Camry was following a Mercedes; is that right?
8  A. My memory on that is that, that I don't --
9  I'm not sure that I knew that until they turned on
10 Ashton Street that they were together.
11     I'm not sure when I picked up on it, but
12 when they both pulled onto Ashton Street, it seemed
13 apparent that they had hooked up in DeMoulas parking
14 lot there.
15 Q. Okay. But you didn't see that they had
16 hooked up, you just deduced that one car was
17 following the other?
18 A. I didn't see them hookup, no.
19 Q. And when they pulled onto Ashton Street,
20 that was off of what street?
21 A. It may be off of Cheevers Street, actually,
22 off Cheevers Street but the main road would be
23 Willard Street. It's a funny intersection. A little
24 triangle intersection where Cheevers and Ashton and

CHRISTOPHER FINNERAL
February 6, 2006

Page 34

1  Dracut, but Willard, so, I guess I'm looking at map
2  number two.
3      Q.  Now, you're looking at Exhibit number 2?
4      A.  Exactly. I'm not sure where Willard Street
5  turns to Broadway Road. And prior to being on
6  Willard slash Broadway, they were on Arlington
7  Street.
8          And Arlington Street is, actually, it is
9  shown over on the right-hand side on three, but they
10 weren't over there. They were up here at that
11 triangle part there.
12     Q.  All right. So, they came toward this funny
13 intersection? This "Y" shaped intersection?
14     A.  Um-hmm.
15     Q.  From Arlington Street?
16     A.  Or, yes, Arlington to Broadway to Willard
17 to Cheever, Ashton, whatever that intersection is
18 there.
19     Q.  Could you take the highlighter and on
20 either map, number two or number three whatever is
21 easier, just draw the route that they took to get to
22 Ashton?
23     A.  Sure.
24     Q.  Okay.

Page 35

1
2          (Witness complies.)
3
4      Q.  No, use the highlighter.
5      A.  I was going to write where DeMoulas is on
6  here, the parking lot.
7      Q.  Let's do the route.
8      A.  I believe DeMoulas is over in this area.
9  They come out of the parking lot. They come up
10 Bridge Street onto Pleasant onto Arlington onto
11 Broadway. The funny intersection, Ashton, and ended
12 up at the end of Pemberton Street.
13     Q.  Okay. All right. So, let's just have the
14 record reflect that Officer Finneral has highlighted
15 this route on Exhibit number 2. Okay. All right.
16         So, they pull over down where you've put
17 that highlighter "X" on Exhibit number 2 and then
18 what happens?
19     A.  What happens, the two cars pull up next to
20 each other, observe what appears to be another
21 transaction between the two vehicles. Me and my
22 partner were pulled to the side of the road back
23 aways when the second transaction takes place.
24 We begin to slowly move up to the road

Page 36

1  towards the two vehicles, and we have some discussion
2  about what's going to happen.
3      Q.  All right. Now, let me just stop you there
4  for a second. Can you put an "X" on Exhibit number 2
5  where you and Officer Hultgren were when you saw this
6  transaction?
7      A.  I don't know exactly where we were.
8      Q.  I understand. But can you put an "X" at
9  the best approximate area where you think you were.
10     A.  I don't know exactly. We were back a
11 couple of hundred feet from where the two vehicles
12 were. You want an "X" with a pen?
13     Q.  Sure.
14
15         (Witness complies.)
16
17     Q.  Okay. And, so, you're putting that "X"
18 about halfway between Willard Street and Pemberton;
19 right?
20     A.  Somewhere in that area, yup.
21     Q.  Okay. And you think, and as you sit here
22 today, you estimate you were about two hundred feet
23 behind?
24     A.  I don't remember exactly, but we were aways

Page 37

1  behind them, yup.
2      Q.  Okay. Well, how many feet? I understand
3  it's not going to be to the inch or anything, but how
4  much feet in back do you think you were?
5      A.  I don't recall. Exact footage I wouldn't
6  be able to say sitting here today.
7      Q.  Okay. And did you actually see something
8  exchanging hands?
9      A.  I saw what I believe to be another drug
10 transaction taking place between the two vehicles. I
11 believe I saw an exchange of items between the two
12 vehicles, yes.
13     Q.  Okay. All right. So, then what happens
14 next?
15     A.  We begin to move closer to the two
16 vehicles. We have some conversation about whose
17 going to do what. The Mercedes was off to the
18 shoulder.
19         In my best memory was we were thinking that
20 that car, we were just going to be able to stop that
21 car. Tommy was going to get out of the car and stop
22 the vehicle. And if the Camry took off, I was going
23 to go with the Camry.
24     Q.  And then what happens?

10 (Pages 34 to 37)

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

CHRISTOPHER FINNERAL
February 6, 2006

Page 42

1  goes down Willard Street straight; right?
2    A.  Yes.
3    Q.  Can you put and "X" on Exhibit number 2
4  where the Mercedes hit Officer Anagnos?
5    A.  I'm not sure exactly, but it is right at
6  the intersection of Humphrey and Willard.  So, do you
7  want another "X" or do you want something different?
8    Q.  Why not put an "X" with a little circle
9  around it.
10
11       (Witness complies.)
12
13   Q.  So, is there, like, pedestrian markings on
14  the pavement there at Willard and Humphrey?  Do you
15  recall?
16   A.  No, I don't recall.
17   Q.  But it was right at the intersection?
18   A.  I believe so, yes.
19   Q.  Okay.  Now, on Ashton Avenue how fast, what
20  speed do you think the Mercedes got up to?
21   A.  My memory was that I thought he was going
22  about fifty miles an hour up Ashton Street.
23   Q.  Okay.  And then did he slow down at all or
24  stop for these stop signs?

Page 43

1    A.  Yes.  He didn't stop for them, but he
2  slowed down.
3    Q.  Okay.  And then what did he do when he got
4  onto Willard Street?
5    A.  Just accelerated down Willard Street
6  towards Bridge Street.
7    Q.  So, how fast do you figure he was going on
8  Willard Street?
9    A.  My estimation was I thought he was going
10  about seventy miles an hour on Willard Street.
11   Q.  And then after he hit Officer Anagnos,
12  where did he go?
13   A.  Continued on Willard Street and then he
14  pulled his car into the rear of DeMoulas or Market
15  Basket parking lot kind of off to the side on some
16  overhanging tree limbs.
17   Q.  And where would that be on map number two
18  if it is on map number two?
19   A.  Well, I'm not so sure that this is so
20  accurate.  I don't know how much of this chunk stays
21  out here, but it's -- I don't know.
22   Q.  Why don't you put a "D" where you think he
23  pulled into DeMoulas.
24

Page 44

1        (Witness complies.)
2
3    Q.  Okay.  Thanks.  And could you just put your
4  signature down on the bottom of that, that map
5  somewhere?
6
7        (Witness complies.)
8
9    Q.  Okay.  Thank you.  So, from the time that
10  you, that you pulled out of that horseshoe driveway
11  until the time that Officer Anagnos was hit, how long
12  do you think that lasted?
13   A.  Approximately twenty seconds.
14   Q.  And how fast do you think you were going on
15  Willard Street?
16   A.  I don't know.
17   Q.  This was a Buick with a six cylinder?
18   A.  I believe so, yes.  That's my memory of
19  what's in that car.  It's a six cylinder.
20   Q.  Okay.  Now, the Buick had no flashing
21  lights of any kind; is that right?
22   A.  Not that car, nope.  Well, probably had
23  hazards but no emergency lights.
24   Q.  Okay.  Standard hazard lights like a car?

Page 45

1    A.  Um-hmm.
2    Q.  Did it have a siren?
3    A.  Not that I'm aware of, nope.
4    Q.  Did it have any grill lights?
5    A.  No.
6    Q.  There were flashing lights in the rear, but
7  you didn't activate those; right?
8    A.  I'm not sure if they were there or not at
9  least the bracket.
10   Q.  They wouldn't have done any good anyway?
11   A.  They have, they may have had brackets and
12  the lights.  But, no, I didn't activate those, no.
13   Q.  Okay.  And did it have any, like, did it
14  have an installed police radio?
15   A.  No.
16   Q.  So, it didn't have a police radio antenna?
17   A.  No.
18   Q.  Do you remember whether the license plates
19  were, like, state plates or just regular civilian
20  plates?
21   A.  Regular plates.
22   Q.  Regular civilian plates?
23   A.  Um-hmm.
24   Q.  On this day, July 31st, 2001, did the

12 (Pages 42 to 45)